# FEBRUARY, 1917

Elmer Marshall v. J. T. Robison, Commissioner of General Land Office, et al.

No. 2764. Decided February 14, 1917.

**1.—Public Lands—Competitive Sale—Right of Highest Bidder.**

On advertisement of public lands for sale to the highest bidder, under article 5410, Rev. Stats., the provision of the statute (art. 5416) that the land shall be awarded "to the one offering the highest price therefor," is mandatory. Such bidder, complying with the law as to payment and execution of obligation, is entitled to an award of the land, and may enforce his right thereto by mandamus against the Land Commissioner. (Pp. 17, 18.)

**2.—Same—Bids—Price per Acre—Aggregate Price.**

An applicant to purchase a section of public land advertised for sale on competitive bids under article 5410, Rev. Stats., bid therefor $4.50 per acre, and, assuming the acreage to be 640 acres, enclosed cash payment and his obligation for the deferred payments amounting in the aggregate to $2880 for the purchase price. A resurvey of the land had shown it to contain 662 acres. Held, that the statute did not require the bids to be at a stated price per acre; that his mistake as to the true acreage did not vitiate his bid; that his offer was tested, not by the bid per acre but by the aggregate amount for which he tendered payment and obligation and that this, being the highest bid received for the land, entitled him to an award of the same as purchaser. (Pp. 16-20.)

**3.—Same—Corrected Bid—Voluntary Increase.**

After having bid for public land, on competitive sale, the highest price offered, and becoming entitled by law to an award thereof, but his bid being rejected by the Land Commissioner, applicant voluntarily corrected his application and increased his bid to an offer of $4.50 per acre for 662 acres, the quantity shown in the section by a corrected survey, instead of the same rate for 640, the acreage originally estimated. Held that, though he became entitled to an award of the land by his original bid, having voluntarily increased his offer mandamus should only require the Land Commissioner to award him the land at such increased price. (P. 20.)

Original application by Marshall to the Supreme Court for writ of mandamus against Robison as Commissioner of the General Land Office, with whom were joined as co-respondents Mrs. J. G. Hall, an adverse claimant of the right to purchase public land, and her husband.

*J. M. Caldwell,* for applicant, cited: Walker v. Marchbanks, 74 S. W., 929; Nesting v. Terrell, 97 Texas, 18; Short v. Seymour, 22 S. W., 925; Rogers v. Concho Cattle Co., 90 Texas, 555; Faucett v. Shepherd, 75 S. W., 538; Samples v. Weaver, 121 S. W., 1130; Ratliff v. Terrell, 97 Texas, 522; Joyce v. Sisk, 62 S. W., 960; Lindsey v. Terrell, 100 Texas, 548; Winans v. McCabe, 92 S. W., 817.

B. F. *Looney,* Attorney General, and G. B. *Smedley,* Assistant, cited: Mound Oil Co. v. Terrell, 99 Texas, 625; Rawls v. Terrell, 101 Texas, 157; Fitzhugh v. Johnson, ·105 Texas, 318; Giraud v. Robison, 102 Texas, 488.

MR. JUSTICE YANTIS delivered the opinion of the court.

This is an original suit by the relator, Elmer Marshall, asking that a writ of mandamus be granted against J. T. Robison, the Commissioner of the General Land Office, requiring him to approve his applications for the purchase of school land sections 2 and 4, block 39, township 4-south, certificates 3185 and 3186, Texas & Pacific Railway Company original grantee, and to require the respondent, J. T. Robison, Commissioner of the General Land Office, to cancel the sale made by him to Mrs. J. G. Hall of said two sections of land. Mrs. Hall and her husband were made parties to the suit as co-respondents by the relator.

It was alleged, and is admitted, that the two sections were classified, appraised and advertised for sale by the respondent, Robison, as containing 640 acres of land each, and also advertised that the said sections would be put upon the market for sale under the competitive bidding system on the 20th day of August, 1914, as 640 acres. On July 13, 1914, the relator made application for the purchase of each of said sections, offering therefor $4.50 per acre. The obligation of the relator attached to each application for said sections promised to pay to the State $2808 as the balance of the purchase money for the section, which, together with $72 in cash, as the first payment which accompanied each of his bids, made the total amount offered by him for each section $2880. Both applications were written on a form made for such purpose with blanks to be filled in by the applicant. There was a blank under the word "acres" in each application, which was filled out by the applicant by writing therein the figures "640." There was a blank under the words "price per acre," and in this blank was written by the applicant "4.50." Above these figures was written:

"I agree to pay for said land the price per acre specified below."

The concluding parts of the applications consist of what is referred to as "obligation." It is a promise to pay, in most parts in the form of an ordinary promissory note, the total sum of $2808 for the purchase of all of said section No. 2, and the same amount for all of said section No. 4, being the balance of the total purchase money which he agreed to pay for each tract of land described, $72 in cash having been paid for each of· said sections.

The co-respondent, Mrs. Hall, made applications also for said section 2 and for said section 4. Each of her applications described the land as containing 640 acres in each section, and for section 2 she offered $4.12½ per acre, and for section 4 she offered $4.06. In her "obligation" for section 2 she bid $2662.48, which, added to $68.27, which had been paid in cash, made the total sum of $2730.75 as her bid on all of sec-

tion 2. Her "obligation" for section 4 was in the sum of $2594.78, which, added to $66.55, the amount of cash which she had remitted, made the total sum of $2661.33 as her bid for all of section 4.

The bids of both parties were opened August 21, 1914, and both the bids of each party were rejected by the Land Commissioner on the ground that section 2, under corrected field notes, contained 662 acres, and section 4, under corrected field notes, contained 655½ acres. He rejected both applications of each party on the ground that they had applied to purchase only 640 acres, and that the law required all tracts to be sold as a whole, and this attempt to buy a portion only of a tract rendered the applications void. Later, on October 13, 1914, after he had been notified of the rejection of his applications, relator filed new applications showing the correct acreage, according to the corrected field notes, showing obligation in his bid for $2904.53 on section 2, and for section 4 showed an obligation in the sum of $2876, with the correct acreage, according to corrected field notes. He also transmitted sufficient additional cash to amount to one-fortieth of the aggregate price offered. On the day following the filing of these new applications by the relator, towit, on October 14, 1914, the Land Commissioner, acting on the two applications of the co-respondent, Mrs. Hall, which he had formerly rejected, awarded each section to her. His reasons for making the award on the applications which he had rejected do not appear, and are perhaps immaterial since the rights of the parties were fixed by the filing of their applications, without regard to his reasons.

It is a mandatory provision of the statutes that the land shall be awarded "to the one offering the highest price therefor." Article 5416, Vernon's Sayles' Civil Statutes. This rule can not be departed from. The State is vitally interested, in selling its public lands, to obtain the highest price which may be offered. In order to secure the highest price which any purchaser is willing to pay for the land, and in order that all prospective purchasers may be treated fairly and with justice, and that partiality may not be shown to any citizen who wishes to buy the land offered for sale, it is provided in article 5410, Vernon's Sayles' Civil Statutes, for competitive bidding through the method of sealed bids being filed with the Land Commissioner, all of which shall be opened on the day following the day when the land comes on the market, said envelopes to be opened and the bids examined at 10 o'clock a. m. on said day. Can anyone doubt that one of the main purposes for such competitive bidding is to secure to the State the highest price that any bidder offers for the land? Can anyone doubt the meaning of the language of article 5416, Vernon's Sayles' Civil Statutes, when it says: "It shall be the duty of the Commissioner to award the land to the one offering the highest price therefor." Necessarily this rule implies that the land shall not be sold to the lowest bidder therefor. The rule laid down is plain and simple, and is the only safe guide to follow, when once it has been ascertained from the applications, which

bidder has offered the highest price for the land. The duty is plain that the land should be awarded to him, and, indeed, his rights are fixed so that he is entitled to have the land awarded to him, and the courts will aid him in the enforcement of such right, he having complied, of course, with other provisions of the law by duly making his application, transmitting to the Land Commissioner one-fortieth of the aggregate price which he had bid for the land, together with an obligation in writing to pay the State the balance of the amount offered in his bid.

It must be conceded that the relator offered the highest price for the tract of land in his first applications, for he offered $2880 for each tract, and properly transmitted to the Land Commissioner $72 in cash for each section. He executed his obligations, which contain all the ingredients of a promissory note, for $2808, which, added to the cash transmitted, made a total offer for each entire tract of $2880, while the total offered on the part of Mrs. Hall, co-respondent, combining both her obligation and the cash she offered for section 2, was $2730.75, which is $149.25 less than was offered for said section by the relator in his first application. Her total bid for section 4 was $2661.33, which was $218.67 less than the total offer made for said section by the relator in his first application. This undoubtedly demonstrates that the relator was the highest bidder for each section, and was entitled in law to have each section awarded to him, unless, as contended by the Attorney General, in behalf of the Land Commissioner, it should be considered that on account of having offered $4.50 per acre for the land, and there being an excess of acreage in each section, according to corrected field notes, his bid was really in excess of $2880, the amount for which he executed his obligation, combined with the cash which he transmitted; and that so estimating, he did not accompany his bid with one-fortieth of such sum when calculated at $4.50 per acre, and when calculating section 2 as containing 662 acres and section 4 as containing 655½ acres, which it is claimed was the true acreage, according to the corrected field notes on file in the Land Office. It is, of course, true that if he did not accompany his bid with cash in the amount of one-fortieth of his total bid, then his bid would be void, and should be rejected. It is also true that the amount of his total bid, if estimated at $4.50 per acre for the number of acres in each section, according to the corrected field notes, his total bid was in excess of $2880; but how shall we ascertain what his total bid was? Will it be determined entirely by the fact that his application offered $4.50 per acre? or will it, since the provision offering $4.50 per acre is in conflict with the amount of the aggregate bid, be determined that his total bid for the tract of land was the total amount of money which he offered as a binding obligation in words and figures to pay for the tract of land? His total bid in words and figures was $2880. This is the total amount for which he agreed to be obligated to pay for each section. Now would it be material for the State to know how much this would amount to per acre?

Certainly, in substance, it would be immaterial, though it might be useful in some way to the Land Commissioner in keeping his records. As a matter of fact the aggregate price offered by him for each tract of land would make the land sell for less than $4.50 per acre, when you consider the excess acreage in each section. But that seems to us to be a mere irregularity in the application, even if he erroneously stated that the bid he made would amount to $4.50 per acre. The statute does not require the application to state what price per acre is bid. Article 5416, Vernon's Sayles' Civil Statutes, only provides: "It shall be the duty of the Commissioner to award the land to the one offering the highest price therefor." This is not a requirement in any sense that he should be fastened down to the method of bidding so much per acre, but it is a requirement that the aggregate amount which is bid by him shall be the highest price offered therefor. Article 5409, Vernon's Sayles' Civil Statutes, provides that, "The purchaser shall transmit to the Land Commissioner one-fortieth of the aggregate purchase money for the particular tract of land." It does not fix the price offered per acre as the standard by which to fix the amount of the applicant's bid, but instead, it fixes in plain words the "aggregate purchase money" as such standard. There are several ways in which a discrepancy might arise between the price per acre stated in the application, and the total or aggregate bid really offered, as shown by the obligation and the cash transmitted. In this instance the discrepancy arose between the stated price per acre and the aggregate amount offered. The discrepancy arose out of the fact that the relator thought the section contained 640 acres, when in fact it contained an excess amount. Such a discrepancy might result from a mere miscalculation. Take as an illustration the bids of the co-respondent, Mrs. Hall. A similar error occurred in the amount stated by her which she would pay per acre. Her offer per acre was substantially less than stated when measured by the aggregate amount of her bids for 640 acres, which is the number of acres her applications stated to be in each section. But the Land Commissioner properly disregarded this error in calculation and was guided by the aggregate amount of her bids, in awarding her the land, but he erroneously held the offer "per acre" to be vital and controlling, instead of the aggregate bids, when passing upon the bids of the relator. Whether such a discrepancy arises from inadvertence or mistake, we think the price per acre stated in the application should yield and be controlled by the aggregate bid offered for the tract of land as tested by the cash transmitted and the obligation filed. When the relator executed and presented his promissory note or obligation payable to the State of Texas in the sum of $2808, it was equivalent in law to his offering to the State of Texas in cash that amount, which combined with the $72 cash transmitted, made $2880 in cash which he offered the owner of the land as his aggregate bid for the tract. It would seem unimportant to the State of Texas to know whether he had made a mistake in the price per acre stated in the application as being the applicant's opinion of how

much it amounted to per acre. It would seem unfair, unjust, and inequitable to the applicant to refuse to consider his bid at all, and to reject it, even if such miscalculation had been made, when the application showed plainly the amount of his total bid for the entire tract. It would not only be inequitable and unjust to him, but it would be placing such a construction on the meaning of the application as to result in rejecting the highest bid in fact which had been offered for the land, and forcing a sale of it to a lower bidder. In this way the State would be placing a construction upon an application which would require it to accept the lower bid instead of the higher bid, whereas it is to the interest of the State to secure the highest bid.

We conclude that respondent, J. T. Robison, Commissioner of the General Land Office, should be required to cancel his sale to the co-respondents, Mrs. J. G. Hall and her husband, J. G. Hall, and to approve the applications of the relator, and to sell and award said two sections of land to him. And had he filed no new applications the award would be entitled to be based upon the aggregate price offered by the relator in his original applications, but since the relator has voluntarily, by his applications filed October 13, 1914, tendered his obligations to pay to the State $2904.53 for section 2 and $2876 for section 4, together with one-fortieth of such amounts in cash, which are better bids than were offered in his original applications, we think the respondent, Robison, should award said sections to the relator on the basis of his said voluntary applications filed October 13, 1914.

MR. JUSTICE HAWKINS dissents.

*Mandamus granted.*