**DUVAL CORPORATION, Relator,**

v.

**Jerry SADLER, Commissioner of the General Land Office, Respondent.**

No. A–11340.

Supreme Court of Texas.

Oct. 12, 1966.

Rehearing Denied Nov. 16, 1966.

**494**

Vinson, Elkins, Weems & Searls, Thomas Fletcher, Lynn R. Coleman, Houston, for relator.

Waggoner Carr, Atty. Gen., Austin, J. Arthur Sandlin, Hawthorne Phillips and Maurice Bullock, Asst. Attys. Gen., for respondent.

Johnson & Dionne, Fort Stockton, for intervenor Bear Creek Mining Co.

SMITH, Justice.

Relator, Duval Corporation, has brought this original suit for mandamus against the Commissioner of the General Land Office of Texas, Jerry Sadler, asking this Court to order the Land Commissioner to approve certain mineral (sulphur) development applications. It is undisputed that all applications reflect statutory compliance under Articles 5388–5403.

All of·Duval's applications for mineral awards were submitted to the Commissioner in accordance with Articles 5388 [1]–5403. These applications involve public free school lands which have been *sold* by the State with a reservation of the minerals in the State of Texas. Relator relies exclusively upon the provisions of Articles 5388 [2]–5403 and has followed the provisions of those Articles for the acquisition of minerals under the land in question. No claim is made to oil, gas, coal or lignite. Respondent has denied all of the applications on the sole basis that the minerals could be acquired by Relator only under the provisions of Article 5421c.

Since each of the separate applications are identical with respect to the nature of the interests involved, and the nature of the lands involved, in the interest of brevity, we specifically identify only one of the

1. All references to statutes are to Vernon's Ann.Texas Civil Statutes unless otherwise indicated.

2. "All valuable mineral bearing deposits, placers, veins, lodes and rock carrying metallic or non-metallic substances of value except oil, natural gas, coal and lignite, that may be in any lands included in this chapter shall be subject to development, sale and patenting as provided in this subdivision. Acts 2nd C.S.1919, p. 241."

tracts of land. On January 24, 1906, J. H. Crawford made application to the General Land Office for the purchase of Section 592, GL and SF Block in Pecos County, Texas. Upon compliance with the laws regulating the sale of public free school lands, a patent was issued by the Governor of Texas to the assignees of Crawford. The patent specifically recites:

"All the minerals in the above described land are reserved to the State."

Respondent, in refusing to approve the Duval applications for mineral awards, was apparently of the opinion that where public free school lands have been sold with a reservation of the minerals, such reserved minerals constitute *unsold public free school lands,* and, therefore, are subject to lease or sale under the provisions of Article 5421c, supra. It is undisputed that the Commissioner has prepared, released, and distributed purported *forms* to govern such a sale and has announced and publicized that applications and bids should be submitted to the Commissioner by March 18, 1966, and that sales were proposed to be held on May 3, 1966.

On April 18, 1966 we set Duval's petition for mandamus for hearing and at the same time entered an order that all further actions by the Respondent and all other persons with reference to the proposed sulphur sale in Pecos County, Texas, be stayed pending final decision of the case.

On April 23, 1966, Bear Creek Mining Company's motion to intervene was granted, and our April 18th order was amended to read:

"It is ordered that all further actions by the respondent, Jerry Sadler, and all other persons, with reference to the proposed sulphur sale in Pecos County advertised to be held on May 3, 1966, be stayed; provided, that the Land Commissioner, Jerry Sadler, is not restrained hereby from issuing exploratory permits on such lands; and provided further that bids may be received, opened, tabulated, processed and conditionally accepted according to law, but no awards or leases for sulphur on lands in Pecos County shall be made pending the decision in these cases."

The order was amended at the request of the Intervenor to protect its rights pending final decision on certain permits which had been granted and certain pending applications for permits for the exploration of sulphur after the Commissioner had announced to the public that sealed bids for leases in Pecos County, Texas, would be received in his office on May 3, 1966. Intervenor concedes that if this Court should hold that Articles 5388 et seq., are the controlling statutes, then it has suffered no loss "because it has simply misconstrued the law," but "if on *the contrary, this * * * Court should decide that Article 5421c is the controlling law, as Intervenor believes it is,* then Intervenor will have suffered an irreparable loss unless this * * * Court permits it to file all of its sealed bids for sulphur leases within fourteen (14) days after the date said order so permitting is filed * * *."* (Emphasis added).

The Respondent takes the position that Section 8 [3] of Article 5421c gives the Land

---

**3.** "All islands, salt water lakes, bays, inlets, marshes and reefs owned by the state, within tidewater limits and that portion of the Gulf of Mexico within the jurisdiction of Texas, and all unsold surveyed public free school land and all rivers and channels belonging to the state shall be subject to lease by the Commissioner of the General Land Office to any person, firm or corporation for the production of oil, gas, coal, lignite, sulphur, salt and potash that may be therein or thereunder, in accordance with the provi-sions of all existing laws pertaining to the leasing of such areas for oil and gas; provided that the leasing of minerals other than oil and gas shall not be subject to the provisions of Article 5359, Revised Civil Statutes, 1925, and subsection 5, Section 8–a of Section 1, Chapter 40, Acts of the 42nd Legislature, Second Called Session, 1931; provided further, that at the discretion of the School Land Board the minerals herein enumerated, other than oil and gas, may be leased together or separately, but oil and gas shall only

Commissioner authority to issue sulphur leases on lands when the surface has been sold and the minerals have been reserved by the State. The Respondent argues that Article 5421c, as amended in 1939, effectively repealed Articles 5388–5403. Alternatively, Respondent contends that since Article 5421c–7,[4] as amended in 1963, specifically mentions lands *sold with a reservation in favor of the State of minerals,* this new act took the place of the old prospecting statutes, Articles 5388–5403. In other words, the Respondent argues alternatively that if he is wrong in his contention that Section 8 of Article 5421c, gives him the authority to issue sulphur leases on lands when the surface has been sold and the minerals have been reserved by the State, it nevertheless is clear that Article 5421c–7 is the only current prospecting statute and that

by the terms of such statute, State lands, and those lands in which the State has reserved the minerals, are not open to prospecting as to sulphur and the other excepted substances. This view, if followed, would lead to a holding that Articles 5388–5403, and Article 5421c–7 are prospecting statutes; that Articles 5388–5403 are squarely in conflict with Article 5421c–7 which provides that there is to be no prospecting for sulphur on land sold with a mineral reservation; that the general repealer provisions contained in Section 3 of the 1963 Amendment to Article 5421c–7, repealed conflicting Articles 5388–5403; that the effect of Articles 5421c–7 was to remove sulphur from the provisions of the prospecting statutes.[5] In short, the ultimate holding would be that there is now no statute allowing the sale or lease of sulphur.

be leased together, and separately from other minerals; provided further, that the royalty reserved to the state shall be not less than one-eighth (⅛) of the gross production or value of oil, gas and sulphur and one-sixteenth (¹⁄₁₆) of the gross production or value of other minerals."

4. "Section 1. Any tract of land belonging to the State, including all islands, salt and fresh water lakes, bays, inlets, marshes and reefs owned by the State within tidewater limits, and that part of the Gulf of Mexico within the jurisdiction of Texas, and all unsold surveyed public free school land and all rivers and channels belonging to the State and any lands sold with a reservation in favor of the State of minerals thereunder, shall be subject to prospect for uranium, thorium, and other fissionable materials, and all other minerals, except oil, gas, coal, lignite, sulphur, salt and potash, shell, sand and gravel, by any person, firm or corporation desiring to prospect same by the filing of an application with the Commissioner of the General Land Office designating the area to be prospected, each such application shall be for an area not in excess of six hundred and forty (640) acres. Such application must be accompanied by rental payment of twenty-five cents (25¢) per acre. As amended Acts 1963, 58th Leg., p. 933, ch. 362, § 1.
"Sec. 2. Permits shall be issued by the Commissioner of the General Land Office giving to the first applicant a period

of one (1) year from the date of filing his application within which to prospect the area designated. A permit may be be extended at the discretion of the Commissioner for periods of one (1) year upon payment of an annual rental of twenty-five cents (25¢) per acre, but in no event to exceed five (5) consecutive years from date of such permit. Permittee may at any time during the effective period of such permit file an application to lease the area covered by the permit, or a designated portion thereof, for the purpose of mining or producing the minerals covered thereby, which application shall be accompanied by the first rental payment of not less than Two Dollars ($2) per acre. The annual rental payments thereafter during the primary term shall be not less than One Dollar ($1) per acre, which shall be payable unless production in paying quantities is being obtained and royalty being paid the State thereon. If the designated area is less than that covered by the permit, the applicant shall forward with his application field notes prepared by the county surveyor or a licensed State land surveyor, describing the area so designated. As amended Acts 1963, 58th Leg., p. 933, ch. 362, § 1."

5. A number of parties owning substantial quantities of mineral classified land in Pecos County and other counties in the Trans-Pecos area of Texas, have filed Amicus Curiae briefs supporting the Respondent's alternative position.

■ From the foregoing summary of the contentions of the parties and our examination of the undisputed facts, it is readily apparent that if writ of mandamus is to be issued in favor of Duval it must be as a result of a holding that Articles 5388–5403 have not been repealed. Unless Duval's right to prospect for, develop and produce sulphur on public free school lands *sold with the minerals reserved to the State, or the minerals therein relinquished,* is governed exclusively by the provisions of Articles 5388–5403, Duval's prayer for relief should be denied. We have before us a legal question of what statute must the Land Commissioner act under with respect to *minerals reserved in public free school land sales.* This Court has jurisdiction of the controversy. This is the proper Court, on mandamus, to determine which statute is applicable. See Freels v. Walker, 1930, 120 Tex. 291, 26 S.W.2d 627; Dolan v. Walker, 1932, 121 Tex. 361, 49 S.W.2d 695; Marshall v. Robison, 109 Tex. 15, 191 S.W. 1136, (1917); Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 171, 104 S.W.2d 4 (1937); Standard v. Sadler, Tex., 383 S.W.2d 391 (1964).

We have concluded that Duval's rights are governed by Articles 5388–5403 and that such Articles have not been repealed. Mandamus should be granted.

■ The parties seem to be in agreement with the well recognized rule that the objective of the Court, when called upon to construe legislative enactments, is to ascertain the purpose of the Legislature in the enactment of the laws relating to the particular matter. The parties apparently are in accord with the rule announced in Wintermann v. McDonald, supra, that the intention of the Legislature is to be ascertained from the language of the statutes and to give effect to all laws bearing upon the same subject, although announced at different sessions of the Legislature. We are warranted in saying that the Legislature, in dealing with public free school lands, has consistently and with clarity drawn a well defined distinction between *unsold* public free school lands and public free school lands *sold* with mineral reservations or with relinquishment of the minerals.

In the absence of Court decisions construing Articles 5388–5403, we resort to an analysis of the various mineral acts since 1913, and to decisions which we deem to be analogous, in principle, to resolve the question involved.

*Mineral Acts*

The Mineral Act of 1913 was all inclusive, in that, it dealt with *all minerals* on all public lands, both unsold and those sold with the minerals reserved or relinquished. The Legislature treated the various minerals as falling into separate categories. Prospecting and development rights were segregated into three general categories, (a) oil and gas; (b) coal and lignite; and (c) other minerals. This early Act recognized, to some extent at least, a valid distinction as to those lands sold and those unsold by making provisions for the payment of damages to the surface owner where sold land was the subject matter.

The Mineral Act of 1917 repealed the Mineral Act of 1913. The 1917 Act indicates some modification of the Legislative scheme for regulation of prospecting and development of minerals on *all* lands. The basic methods for securing sulphur rights were outlined in Sections 10, 11 and 12 of the 1917 Act. Again we find a well defined distinction was drawn by the Legislature between lands unsold and those lands previously sold where there was a reservation of minerals to the State.

In 1919, the first Relinquishment Act[6] was enacted. This Act, codified into Articles 5367–5379, dealt with surveyed free school and asylum lands theretofore sold or thereafter to be sold with a mineral classification or a mineral reservation. This Act

6. Acts 1919, 36th Leg., 2nd C.S., p. 249.

has no applicability since it applies only to oil and gas; however, we mention it to point up the historical background of the present methods of mineral reservations.

The Mineral Act of July 23, 1919, controlled oil and gas leasing on unsold state lands. This Act, codified into Articles 5353–5366, like the 1919 Relinquishment Act, has no applicability to this controversy, but it also demonstrates the legislative history of the current methods of mineral reservation.

The Mineral Act with which we are particularly concerned is the Act of July 31, 1919. See Acts of the 36th Leg., Second Called Session, ch. 79, p. 241. This Act, codified and amended as Articles 5388–5403, has no application to oil and gas rights, since these rights were completely covered by the first Relinquishment Act of 1919, supra, as to *sold* lands and the Mineral Act of July 23, 1919, as to *unsold* lands. Furthermore, Articles 5388–5403 do not cover coal and lignite.

Two other acts should be discussed. These two acts were adequately analyzed in Standard v. Sadler, supra. The Legislature enacted two bills in 1931. The first, Senate Bill 310, was later held to be unconstitutional in its entirety in Empire Gas and Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265. The effect of this decision was to leave Articles 5388–5403, the Mineral Act of July 31, 1919, in full force and effect. The second bill, enacted in 1931, was House Bill 358. As stated in Standard v. Sadler, this bill became known as the Sales and Leasing Act of 1931. This Act, with subsequent amendments, is now codified as Articles 5421c and 5421c–1 through 5421c–9. Section 13 of this second act expressly repealed Articles 5323, 5338 and 5374, Revised Statutes of 1925, and repealed, as well, all conflicting laws. We held in Standard that the Relinquishment Act of 1919 was not repealed. However, we went on to say that "[i]f repeal was effected it was by implication only, and re-

peal by implication is not favored", citing Gordon v. Lake, 163 Tex. 392, 356 S.W.2d 138, 193; Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 171, 104 S.W.2d 4. Since the provisions of Article 5421c–1 through 5421c–9, as amended, are not in conflict with Articles 5388–5403, Respondent cannot successfully contend that any provision of Sec. 13 of the second 1931 Act repealed Articles 5388–5403. We agree with Respondent and the Amici Curiae Landowners that Articles 5388–5403 set out a comprehensive scheme of prospecting, but we disagree with the contention that the 1963 amendment of Article 5421c–7 repealed Articles 5388–5403 by the general repealer clause contained in Section 3 therein, thereby leaving 5421c–7 the only prospecting statute. We find no words in Article 5421c–7 which support the contention that the exception of sulphur from the scope of the Act means that there can be no prospecting for sulphur on the classes of land covered by the statute. Article 5421c–7 does not leave a "void" as to sulphur. To the contrary, the provisions of the article are consistent with and recognize the continued applicability of Articles 5388–5403 to sulphur in lands sold with a mineral reservation. An analysis of Article 5421c–7, leads us to conclude that rather than repealing Articles 5388–5403, specific recognition was given to these articles. See Section 1 of Article 5421c–7. While Article 5421c–7 provides a method for the acquisition of certain minerals under lands belonging to the State, both *unsold and surveyed public school land* and land *sold* with a reservation in favor of the State of minerals thereunder, it, nevertheless, specifically excepts "oil, gas, coal, lignite, *sulphur*, salt and potash, shell, sand and gravel" from the scope of the Act. The pertinent part of Section 1 of Article 5421c–7 reads:

"Any tract of land belonging to the State, including * * * any lands sold with a reservation in favor of the State of minerals thereunder, shall be subject to prospect for uranium, thorium, and

other fissionable materials and all other minerals, *except* oil, gas, coal, lignite, sulphur, salt and potash, shell, sand and gravel, by any person * * *." (Emphasis added.)

■ Our interpretation of this Act leads us to believe that the Legislature had no intention of repealing any of the laws in effect at the time of the enactment of Article 5421c–7 which dealt with any of the excepted minerals. The Legislature recognized that Articles 5388–5403 adequately provided for the acquisition of sulphur rights, otherwise it would not have excepted sulphur when Article 5421c–7 was adopted in 1963.

In summary, Article 5388, which we have declared to be applicable, provides in part:
"All * * * mineral * * * deposits * * * except oil, natural gas, coal and lignite, that may be in any lands included in this chapter shall be subject to development, sale and patenting as provided in this subdivision."

■ To ascertain the "lands included in this chapter", one has only to look at the definition of such lands found in Article 5383, the first subdivision of Chapter 5, Title 86, Lands—Public, of which Chapter 5, Article 5388 is a part. There it will be found that the Legislature was concerned, in adopting Article 5388, with mineral rights (other than oil and gas, coal and lignite) under *public school lands sold with a reservation of minerals to the State*. It is clear from the provisions of Article 5421c that it was the intent of the Legislature in the enactment of this statute to deal with all of the unappropriated and unsold public domain rather than with public free school land *sold* with a reservation of the minerals

therein. The two statutes, rather than being in conflict, deal with a separate and distinct subject matter and area of the public domain. It is clear that each statute constitutes an additional part of the general body of law enacted with respect to minerals and their control. Each statute clearly points up the legislative intent to bring forward the legislative policy of distinguishing between, and separately providing for, the sale, development, patenting, and disposition of minerals reserved in sales of public free school lands or minerals in unsold public free school lands.

It is significant that Article 5400, of the series of Articles 5388–5403, and other acts relating to public free school lands *sold* with a reservation of minerals or with relinquishment provisions, protect the rights of the surface owner. We point out that Sections 8, 9 and 10 of Article 5421c which Respondent now contends are controlling, contain no provision for the protection of the surface owner.

This Court, in Standard v. Sadler, supra, recently held that Article 5421c–8 limits the Land Commissioner's powers to leasing unsold surveyed public free school land.[7] The Standard v. Sadler case, in principle, supports our holding in the present case. The case involved land which had been reacquired by the State through a judgment rendered on June 6, 1925, in an escheat proceeding, and was set apart to the Permanent Free School Fund under the provision of Article 3281.[8] The tract was later sold by the State to Leo Standard in December, 1936, and a patent, in which all minerals were reserved to the State, was issued March 14, 1939. Leo Standard conveyed the premises to B. L. Standard and wife on February 14, 1946. On November 5, 1963, the present Land Commissioner,

7. Article 5421c–8 also gives the Commissioner the power to lease islands, salt water lakes, bays, inlets, marshes and reefs owned by the State, within tidewater limits and that portion of the Gulf of Mexico within the jurisdiction of Texas [and] * * * all rivers and channels belonging to the State." These lands are similarly unsold, though the State holds them in a different capacity from unsold public free schools lands.

8. Escheat of property in Texas is governed by Articles 3272–3289, Article 3281 was amended in 1934. See Acts of 43rd Leg., 3rd C.S., Ch. 60, p. 112.

claiming that the authority of the landowner to negotiate and execute oil and gas leases was terminated by the Sales and Leasing Act of 1931, executed and delivered to Humble Oil & Refining Company an oil and gas lease on the Standard tract of land. This oil and gas lease was developed and production thereon was obtained thereunder over the protest of B. L. Standard. On February 24, 1964, Standard executed and delivered to Trace Mining Company an oil and gas lease of the tract similar in terms to that given by the Land Commissioner to Humble. When the Land Commissioner refused to accept this lease, Standard and Trace Mining Company sought a writ of mandamus directing the Land Commissioner to accept and file the Standard-Trace oil and gas lease. We granted the writ of mandamus. We held, in effect, that when the State sold the escheated land involved it was *sold* public free school lands with reservation of the minerals. We pointed out that the Legislature undertook by the provisions of Article 3281 to define the powers of the Commissioner of the General Land Office to deal with escheated lands. We rejected the contention of the Land Commissioner and Humble that the provisions of Article 3281 precluded Standard from executing an oil and gas lease on the land in controversy. In doing so, we said:

"By the first three sentences the Commissioner's power to lease was defined. By the remaining provisions his power to sell was defined. This arrangement in dealing with the subject matter of the Commissioner's powers suggests in itself that the Legislature intended that the power to lease exist only until the lands were sold. The three sentences * * * also suggest that the Legislature intended the power to extend only to *unsold* lands. * * * Now, obviously, the Legislature did not intend that the Commissioner should have power to lease *sold* lands for any of the purposes indicated in the first and second sentences. Is there any sound reason for believing that the Legislature

intended that the leasing power conferred by the third sentence be broader, and that it extend to both sold and unsold lands?"

This Court, in Standard, did not stop with an analysis of Article 3281, but went on to reason, "[i]f, as Humble asserts, the purpose of this language was simply to incorporate the procedure provided in Art. 5421c for executing leases and make that procedure applicable in the leasing of both sold and unsold lands, why was that purpose not plainly stated as was done with reference to forfeited lands in Art. 5371, where it is provided that such land 'shall be subject to lease for oil and gas *under the procedure* provided by law for the leasing of unsold surveyed public school lands?' * * * What we hold is that Art. 3281 confers no power on the Commissioner to execute leases for oil and gas and other mineral development on escheated land which has been sold by the State from the Permanent Free School Fund. And we hold further that when the full fee title to escheated land is owned by the Fund and the land is sold with a reservation of all minerals, the Relinquishment Act of 1919 constitutes the owner of the soil the agent of the State for the purpose of negotiating and executing oil and gas leases thereon."

It should be noted that our opinion expressly limited the Court's holding to a situation where the land "is sold with a reservation of all minerals."

In Standard v. Sadler, the escheated lands which were later sold were placed by the Court in the same category as the Legislature has placed sold lands with reservation of all minerals, the type of lands involved in the present case. In view of our holding in Standard v. Sadler, it would be illogical to hold in this case, wherein sold land is involved, that reserved minerals equate with unsold lands, hence Articles 5388–5403 have no application.

We come now to the judgment to be entered. Since Articles 5388–5403 are

applicable and since Duval has complied with the statutory requirements contained therein, it is the mandatory duty of the Land Commissioner to perform the ministerial act of issuing the minerals awards to Duval, as prayed for. Article 5393 provides:

"When the application has been considered and all things have been done in compliance with the law, the Commissioner shall issue to the applicant an award for the area. * * *"

█ We construe this to mean that the Land Commissioner is given only the ministerial duty of ascertaining the fact of compliance. Compliance with the statute vests the applicant with absolute right. Articles 5388–5403 do not in any manner vest the Land Commissioner with authority to refuse to issue such awards, when the fact is, or when the Land Commissioner has ascertained the fact to be, that the applicant, Duval in this case, has factually done the things which the legislative offer of such statutes require. See State v. Robison, 119 Tex. 302, 30 S.W.2d 292, 297 (1930); Wertheimer v. Walker (1936, no writ hist.) 96 S.W.2d 831; Pohle v. Robertson, 102 Tex. 274, 277, 115 S.W. 1166, 1168 (1909); Schneider v. Lipscomb County National Farm Loan Ass'n, (1947) 146 Tex. 66, 202 S.W.2d 832. In Pohle v. Robertson, this Court said: "The legal efficacy of a purchaser of school land comes from the law which gives effect to the taking of the steps by which it authorizes the acquisition of title, and not from the consent of the officer to an application." In Schneider, this Court said that the *award* is not a sale. The sale is "accomplished by the offer made by the State in the statute [in our case 5388–5403] which prescribes the terms and conditions of the sale, and by the acceptance of the offer by the intending purchaser in his taking the several steps for purchase as set out in the statute."

The writ of mandamus shall issue. The Respondent, Jerry Sadler, Land Commissioner of Texas, is ordered and directed to issue mineral awards on Duval's applications marked Exhibits "F–1" through "F–30" and "G–1" through "G–32"; to process applications presently on file in the General Land Office, marked Exhibits "M–1" through "M–36"; to immediately file the applications marked "Exhibits "O–1" through "O–64" as of February 21, 1966, the timely date on which they were tendered for filing and refused by him; he is further directed to process such applications. He is directed to refrain and desist from interfering with the performance by the County Surveyor of Pecos County, Texas, of those duties laid upon such county surveyor by the terms and provisions of Articles 5391 and 5392, as amended. The Respondent, Land Commissioner, is directed to receive, file, ascertain the fact of statutory compliance, and then to issue mineral awards thereon. When such applications "Exhibits "Q–1" through "Q–36" shall have ripened for filing pursuant to said statutes, the Respondent is directed to receive and file such applications and to process them in accordance with Articles 5388–5403, as amended.