**B. L. STANDARD et al., Relators,**

**v.**

**Jerry SADLER, Commissioner of the General Land Office, et al., Respondents.**

No. A–10078.

Supreme Court of Texas.

Oct. 7, 1964.

Rehearing Denied Nov. 18, 1964.

Rutledge & Rutledge, Abilene, for relator.

W. R. Niblack, Dallas, Tex., Will Wilson, Joe Osborn, Austin, Walter B. Morgan, Houston, Tex., A. W. Walker, Jr., Dallas, for respondent Humble Oil & Refining Co.

Waggoner Carr, Atty. Gen., Milton Richardson, Asst. Atty. Gen., Austin, for respondent Sadler.

CALVERT, Chief Justice.

B. L. Standard and Trace Mining Company, a partnership, seek a writ of mandamus directing Jerry Sadler, Commissioner of the General Land Office, to accept and file an oil and gas lease of a 67⅔-acres tract of land in Taylor County. The lease is executed by Standard and his wife to Trace Mining Company. Humble Oil & Refining Company is made a respondent in the proceeding because it claims to own an exclusive oil and gas lease on the same property.

The relevant facts are undisputed. The fee simple title to the tract of land, including all minerals, was acquired by the State of Texas through a judgment of a district court of Taylor County rendered June 6, 1925, in an escheat proceeding, and was set apart to the Permanent Free School Fund under the provisions of Art. 3281.[1] The tract was sold by the State to Leo Standard in December 1936, and a patent, in which all minerals were reserved to the State, was issued March 14, 1939. Leo Standard conveyed the premises to B. L. Standard and wife on February 14, 1946.

---

1. All references to statutes are to Vernon's Texas Civil Statutes unless otherwise indicated.

On November 5, 1963, Jerry Sadler, Commissioner of the General Land Office, executed and delivered to Humble Oil & Refining Company an oil and gas lease on the tract, which lease grants the exclusive right to Humble to prospect for and produce oil and gas for a primary term of five years and as long thereafter as oil and gas are produced in paying quantities. Although notified by B. L. Standard that the validity of its lease was being questioned, Humble entered upon the premises and commenced drilling operations on March 5, 1964. Production was obtained March 25, 1964.

On February 24, 1964, B. L. Standard executed and delivered to Trace Mining Company an oil and gas lease of the tract similar in terms to that given by Sadler to Humble. The lease was filed for record in Taylor County on March 10, 1964, and a certified copy was tendered to Sadler for filing on March 11, 1964. Sadler refused to accept and file the lease and still refuses to do so. Under the provisions of Art. 5421c–2 the lease cannot be effective, even if authorized by law, until a certified copy is filed in the General Land Office. Relators thus have no recourse for adjudicating the validity of their lease except through this direct proceeding in this Court. If the lease is valid, writ of mandamus should issue; but if it is not valid, the prayer for relief should be denied.

The validity of Relators' lease turns on the soundness of their argument that under the Relinquishment Act of 1919 Standard, as owner of the soil, is the agent of the State with the exclusive right to negotiate and execute oil and gas leases on behalf of the State.

The Attorney General, representing respondent Sadler, asserts that the argument is unsound because the Relinquishment Act of 1919 has been repealed by a 1939 Act of the Legislature. Respondent Humble differs with the position of the Attorney General. It asserts that the provisions of the Relinquishment Act of 1919 still govern the leasing of lands sold from the Perma-nent Free School Fund with a mineral classification or mineral reservation before enactment of House Bill 358 in 1931; but it asserts that the argument of Relators is unsound because the land involved here was sold thereafter, and that leasing of such lands is governed by the provisions of that Act and subsequent amendments. Alternatively, Humble asserts the argument is unsound because a 1934 amendment to Art. 3281 confers exclusive authority to lease escheated lands on the Commissioner of the General Land Office.

The various arguments require examination of the statutes mentioned in some detail.

The first Relinquishment Act was enacted in 1919. See Acts 36th Leg., 2nd Called Session, ch. 81, p. 249. Its provisions, as subsequently amended, are now included in Arts. 5367–5379. Its history and purposes and the history of the times which prompted its enactment have been reviewed in previous opinions of this Court. See Greene v. Robison, 117 Tex. 516, 8 S.W.2d 655; Empire Gas and Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265; Lewis v. Oates, 145 Tex. 77, 195 S.W.2d 123; Norman v. Giles, 148 Tex. 21, 219 S.W.2d 678. As construed in Greene v. Robison, supra, the Act constitutes the owner of the soil the agent of the State for the purpose of negotiating and executing oil and gas leases on surveyed and unsurveyed public free school land and asylum land sold by the State with a mineral classification or mineral reservation by which all minerals are reserved to the State. The operative effect of the Act is by its broad terms both prospective and retrospective. Buvens v. Robison, 117 Tex. 541, 8 S.W.2d 664. It will be referred to throughout this opinion as the Relinquishment Act of 1919.

In 1931 the Legislature enacted two bills dealing with sales and mineral leases of public school lands. The first was Senate Bill 310, which dealt exclusively with lands sold with mineral classification or mineral reservation. See Acts 42nd Leg., Reg. Ses., ch. 23, p. 28. The operative effect of the

bill was both prospective and retrospective with respect to such lands. By its terms the Legislature sought to enlarge the interests of owners of such lands theretofore sold to include a fee ownership of $^{15}/_{16}$ of the minerals, to validate leases theretofore executed by them on a basis of such ownership subject to certain statutory payments to the State, and to authorize the execution of leases by owners for oil and gas and other mineral development in which leases a free royalty of $^1/_{16}$ would be reserved to the State. This Act will be referred to as the Relinquishment Act of 1931. It was declared unconstitutional in its entirety in Empire Gas and Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265.

The second bill enacted in 1931 was House Bill 358. See Acts 42nd Leg., Reg.Ses., ch. 271, p. 452. It will be referred to as the Sales and Leasing Act of 1931. With subsequent amendments, it is now Art. 5421c. Other amendments and additions are shown in Arts. 5421c–1 through 5421c–9. The operative effect of this Act was strictly prospective. Section 1 declared:

"All lands heretofore set apart to the public free school funds under the Constitution and laws of Texas, and all of the unappropriated and unsold public domain remaining in this State of whatever character, except river beds, and channels, and islands, lakes and bays, and other areas within tide water limits, are subject to control and sale under the provisions of this Act."

As pertinent here, the Act provided for sale by the Commissioner of the General Land Office of surveyed public free school land to the highest bidder, with reservation to the State of a $^1/_8$th free royalty on sulphur and a $^1/_{16}$th free royalty on all other minerals produced. The Act also authorized the Commissioner to execute mineral leases of surveyed public free school land to the highest bidder. Authority of the Commissioner to execute such leases was provided in Section 8, which read:

"All islands, salt water lakes, bays, inlets, marshes and reefs owned by the State within tidewater limits, and that portion of the Gulf of Mexico within the jurisdiction of Texas, *and all unsold public free school land, both surveyed and unsurveyed, shall be subject to lease by the Commissioner* to any person, firm or corporation for the production of the minerals, except gold, silver, platinum, cinnabar and other metals, that may be therein or thereunder, in accordance with the provisions of this Act and subdivision 2, Chapter 4, Title 86, Revised Statutes of 1925, relating to leasing public areas, in so far as same is not in conflict herewith." [2]

Section 13 of the Act expressly repealed Arts. 5323, 5338 and 5374, Revised Statutes of 1925, and repealed, as well, all conflicting laws.

Changes were made in some of the provisions of the Sales and Leasing Act of 1931 and certain new provisions were added by enactment in 1939 of House Bill 9. See Acts 46th Leg., Reg.Ses., ch. 3, p. 465. Section 1 of House Bill 9 dealt exclusively with sale and leasing of vacant and unsurveyed land, a matter with which we are not concerned. Section 2 amended Section 8 of the Sales and Leasing Act of 1931, quoted above, by carrying that section forward verbatim and adding a proviso reading as follows:

"Provided, however, that nothing in this Act shall be construed as removing from or interfering with the rights and powers of the surface owner of land sold or to be hereafter sold by the State, with a mineral reservation, to act as agent of the State in making and executing mineral leases covering and affecting such lands, but the authority of such surface owner shall remain the same as provided by law, and is in no wise abridged, modified or removed by this Act."

Two of the new sections added were Section 4-a and Section 5. Section 4-a read:

"No mineral lease executed by an owner or owners of land or minerals under what is commonly known as the Relinquishment Act shall be effective until a certified copy of such lease is filed in the Land Office. No such lease executed after the effective date hereof shall be binding upon the State unless it recites the actual and true consideration paid or promised therefor."

That section appears in Vernon's Texas Civil Statutes today as Art. 5421c–2. Section 5 created the School Land Board composed of the Commissioner of the General Land Office, the Governor and the Attorney General, and prescribed the duties of the Board as including the power "to set all dates for the leasing and the sale of surveyed lands, and to determine the prices at which any land, whether surveyed or unsurveyed, shall be leased or sold." The Board was directed to adopt rules regulating the sale and leasing of "areas included herein not inconsistent with this Act and other laws on the subject for the sale and lease of school and asylum lands * * *."

The first numbered paragraph of Section 5 provided:

"*All lands set apart for the permanent free school fund* and the several asylum funds by the Constitution and the laws of this State and the mineral estate in river beds and channels, and the mineral estate in all areas within tidewater limits including islands, lakes, bays, and the bed of the sea, belonging to the State of Texas, *are subject to control and disposition in accordance with the provisions of this Section and other pertinent provisions of this Act and other laws not in conflict herewith;* provided, however, that the provisions of this Act shall not apply to those lands awarded to the State of Texas by decree of the Supreme Court of the United States on March 17, 1930, in

Cause entitled: The State of Oklahoma vs. The State of Texas [50 S.Ct. 247, 281 U.S. 109, 74 L.Ed. 731, 1122], the United States of America, Intervenors, but said land shall be sold and disposed of in accordance with the provisions of Chapter 185, Acts of the Regular Session of the Forty-second Legislature."

Section 6 repealed all laws or parts of laws in conflict with the provisions of the Act.

In 1953 the Legislature enacted House Bill 241. See Acts 53rd Leg., Reg.Ses., ch. 57, p. 77. The enactment rewrote Section 8 of the Sales and Leasing Act of 1931 as amended by House Bill 9. Among the changes effected was the elimination of the proviso quoted above, which had been added in 1939. The section was amended once again by the enactment of Senate Bill 347 in 1957. See Acts 55th Leg., Reg.Ses., ch. 209, p. 434. The amendment did not restore the quoted proviso, and it is not now in Section 8 as it appears in Art. 5421c.

 With the foregoing brief analysis of pertinent statutory enactments, we consider first the Attorney General's contention that the Relinquishment Act of 1919 was repealed by the enactment of House Bill 9 in 1939; and we hold that it was not repealed. If repeal was effected it was by implication only, and repeal by implication is not favored. Gordon v. Lake, 163 Tex. 392, 356 S.W.2d 138, 139; Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 171, 104 S.W.2d 4. In Wintermann v. McDonald we adopted the following rule which is controlling here (102 S.W.2d 171):

"In the absence of an express repeal by statute, where there is no positive repugnance between the provisions of the old and the new statutes, the old and new statutes will each be construed so as to give effect, if possible, to both statutes. 39 C.J. § 75, p. 140. This rule is particularly applicable to the construction of statutes relating to our public school lands, and to the development of the minerals thereunder."

There is no positive repugnance between House Bill 9 and the Relinquishment Act of 1919. Section 5 of House Bill 9 created the School Land Board with authority to sell and lease lands set apart to the permanent free school funds, which lands were declared to be "subject to control and disposition in accordance with the provisions of this Section *and other pertinent provisions of this Act and other laws not in conflict herewith.*" It also declared that all leases should "be issued by the Commissioner of the General Land Office in accordance with the minutes as approved by the School Land Board"; but Section 2 of the same bill, in amending Section 8 of the Sales and Leasing Act of 1931, provided that only *"unsold* public free school land" should be subject to lease by the Commissioner for the production of minerals, with certain exceptions. Moreover, Section 4–a, now Art. 5421c–2, constituted express recognition of the continued existence of rights under the Relinquishment Act of 1919 by providing a procedure for protecting the rights. Addition of the proviso to Section 8 served only to make recognition and preservation of such rights doubly certain, and its later elimination does not require a holding of repugnancy.

We would be reluctant under any circumstances to hold that the Relinquishment Act of 1919 has been repealed, and we are unwilling to do so in the absence of express repeal or clear repugnancy. Thousands of acres of public free school lands were sold with a mineral classification or mineral reservation between 1895 and 1931. No doubt some of this land is in areas where there has yet been no oil and gas discovered. To say that the Relinquishment Act of 1919 which culminated the long and bitter fight waged by purchasers of school lands for a share in the minerals on and under their lands will benefit only those in areas where early discovery of oil and gas was made would do grave injustice to those who, having the same claim of right, are the victims of fortuitous circumstance. We held in Wintermann v. McDonald, 129

Tex. 275, 102 S.W.2d 167, 104 S.W.2d 4, that the Sales and Leasing Act of 1931 did not repeal the Relinquishment Act, and we find no sound basis for saying that subsequent amendments thereto did so.

We consider next Humble's argument that the right conferred by the Relinquishment Act of 1919 on landowners to negotiate and execute oil and gas leases as agent of the State was terminated, as to lands thereafter sold, by the Sales and Leasing Act of 1931. We cannot agree with the argument. It is based on what we conceive to be an erroneous interpretation of the Sales and Leasing Act of 1931.

It had been thought by many that the Relinquishment Act of 1919 was effective to vest fee title to $15/16$ of the minerals in those who had theretofore or who thereafter purchased public free school lands with a mineral classification or mineral reservation. That this Court's decision in 1928 in Greene v. Robison, supra, that it did not do so came as a shock to many people is demonstrated by the emergency clause of the Relinquishment Act of 1931. The decision prompted the Legislature to enact the Relinquishment Act of 1931 and the Sales and Leasing Act of 1931.

The Legislature undoubtedly intended the two Acts to complement each other and that they should be effective to vest fee title to $15/16$ of all minerals in all purchasers of school lands, both past and future. Humble's interpretation of these two Acts ascribes to the Legislature an intent that the first Act apply *only* to lands theretofore sold and that the second Act apply to *all* lands thereafter sold. Speculatively, that may have been the intent. Inasmuch as the second Act provided that in all sales thereafter made a $1/8$ royalty on sulphur and a $1/16$ free royalty on all other minerals should be reserved to the State, it is logical to assume that the Legislature intended *at the time* that no future sales of school lands would be made with a reservation of all minerals to the State. However, it should be noted that the provisions of the

first Act were broad enough to authorize leasing by the landowner if they were so sold. By Section 2 of that Act, authority to lease was conferred, not just on owners of land theretofore sold, but on "The owner of land sold by the State with mineral reservation, or mineral classification."

■■ But however that may be, when the Relinquishment Act of 1931 was declared unconstitutional in 1932 in Empire Gas and Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265, the Relinquishment Act of 1919 was left in full force and effect. Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 104 S.W.2d 4. And see: Culberson v. Ashford, 118 Tex. 491, 18 S.W.2d 585, 587; Galveston and W. Ry. Co. v. City of Galveston, 96 Tex. 520, 74 S.W. 537, 540. So, the question here is not to be ruled by what the Legislature intended to do by the two Acts of 1931, but what it intended to do and did do by its only valid enactment of 1931. The question is: Did the Sales and Leasing Act of 1931 nullify, as to all school lands sold thereafter, authority granted by the Relinquishment Act of 1919 to the owner of the soil to execute oil and gas leases as agent of the State? The clear answer to the question is that it did not.

■ In asserting that the Sales and Leasing Act of 1931 did nullify such authority, Humble relies principally on the language of Section 1 of the Act (now Section 1 of Art. 5421c), heretofore quoted in full, which declares that "All lands heretofore set apart to the public free school funds under the Constitution and laws of Texas * * * are subject to control and sale under the provisions of this Act," and on our holding in Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 104 S.W.2d 4, that in executing mineral leases on land sold under the Act the landowner acts, not by authority conferred by the Relinquishment Act of 1919, but by implied authority of the Sales and Leasing Act of 1931 itself. But enactment of the Sales and Leasing Act of 1931 could not, and did not, preclude the Legislature from later directing that all or

a part of the lands belonging to the public free school funds be sold *with a reservation of all minerals,* in which event there is no sound basis for saying that owners of lands so sold could not exercise authority conferred by the Relinquishment Act of 1919 to execute oil and gas leases. The Commissioner of the General Land Office, acting under direction of the School Land Board, could not execute oil and gas leases on such lands because his authority to execute such leases is limited to *unsold* lands by Section 8 of Article 5421c; and our holding in Wintermann that the landowner's authority to lease sold lands was an implied authority is plainly limited to lands *sold under the Sales and Leasing Act of 1931.* If the Relinquishment Act of 1919 did not fill the void in the circumstance imagined, there could be no leasing of *sold* surveyed school fund lands for production of oil and gas.

The possibility that the Legislature might direct that all or a part of the lands belonging to the public free school fund be sold with a reservation of all minerals is not purely imaginary. That is precisely what the Legislature did with respect to escheated lands when it amended Art. 3281 in 1934; and unless that article precludes Standard from executing an oil and gas lease on his land, he has authority to do so under the Relinquishment Act of 1919. This brings us to consideration of Humble's alternative reason for saying that Relators' argument is unsound.

Escheat of property in this State is governed by Arts. 3272–3289. Art. 3281 was amended in 1934. See Acts 43rd Leg., 3rd C.S., ch. 60, p. 112. If, prior to the amendment, the trial court found that real estate was subject to escheat, judgment was rendered that the State recover the land, fixing a minimum price at which it could be sold, and awarding a writ of possession. Art. 3279, Revised Civil Statutes, 1925. Upon receiving the writ of possession, the sheriff was required to seize and sell the land as under execution; but if the bids were for less than the minimum price fixed in the judgment, the Attorney General was au-

thorized to sell the land thereafter as lands bid in by the State are sold. The proceeds were required to be paid into the State Treasury. Art. 3281, R.C.S., 1925; Art. 4403. Humble contends that Art. 3281, as amended in 1934, creates a special category of permanent free school fund lands, the sale and leasing of which lands is governed entirely by the terms of the article, and that the provisions of the article preclude Standard from executing an oil and gas lease on the land in controversy.

Art. 3281, as amended in 1934, after setting escheated lands apart to the Permanent Free School Fund and directing that they be listed as escheated permanent free school lands, continues:

"The Commissioner of the General Land Office may lease said lands for grazing purposes under existing laws relating to the leasing for grazing purposes of unsold school lands. The Commissioner of the General Land Office may lease said lands for agricultural, residential, business or other purposes for a term of not to exceed two (2) years, said rental to be payable in money, the amount of said rental and all other terms of the lease to be fixed by the Commissioner of the General Land Office. *Any escheated permanent free school lands shall be subject to lease for oil and gas development or subject to other mineral development under Statutes governing the leasing for mineral purposes [of] all other unsold permanent free school lands.* Any escheated permanent free school lands may be sold by the Commissioner of the General Land Office for not less than one-tenth of the purchase price in cash and the balance of said purchase price payable in nine equal annual installments, said deferred installments to bear interest at the rate of six (6) per cent per annum. Any lands so sold shall be sold to the highest bidder as are other public free school lands but no escheated lands shall be sold at a price of less than Two Dollars and Fifty Cents ($2.50) per acre. All sales of escheated permanent free school lands shall be with a reservation to the State of all the minerals in the land in favor of the Permanent Free School Fund. All sums received from the leasing, mineral developments, or sale of escheated lands shall be deposited in the Permanent School Fund of Texas. The Commissioner of the General Land Office is authorized to adopt such regulations as he deems necessary to carry out this Article. Said regulations or forms adopted shall be approved by the Attorney General."

It may be admitted that Article 3281 creates a special category of land in the Permanent Free School Fund. That fact was recognized by this Court in Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, 172, 104 S.W.2d 4. But it does not necessarily follow that the article contains special leasing provisions which preclude Standard from asserting his rights under the Relinquishment Act of 1919. Whether it does so or not depends on proper interpretation of the one controlling sentence which we have emphasized. If the sentence means that the Commissioner of the General Land Office is authorized to lease *all* escheated permanent free school lands, sold and unsold, for oil and gas and other mineral development according to the procedures provided in other statutes for leasing of *unsold* school lands, as asserted by Humble, Standard is precluded. If it means that the Commissioner's authority to lease for oil and gas and other mineral development is confined to *unsold* lands as in the case of other permanent free school lands, as Relators contend, Standard is not precluded. It is our duty to give the sentence the meaning the Legislature intended it to have in so far as it lies within our ability to do so. Viewing the article from its four corners, and thus interpreting the sentence in context with the article's other provisions, we have

concluded that the Legislature intended it to have the meaning which Relators give to it.

The Legislature undertook by the quoted provisions of Article 3281 to define the powers of the Commissioner of the General Land Office to deal with escheated lands. By the first three sentences the Commissioner's power to lease was defined. By the remaining provisions his power to sell was defined. This arrangement in dealing with the subject matter of the Commissioner's powers suggests in itself that the Legislature intended that the power to lease exist only until the lands were sold.

The three sentences conferring power to lease also suggest that the Legislature intended the power to extend only to *unsold* lands. The first sentence confers power to lease for grazing purposes. The second sentence confers power to lease for agricultural, residential, business or other purposes. The third sentence confers power to lease for oil and gas or other mineral development. Now, obviously, the Legislature did not intend that the Commissioner should have power to lease *sold* lands for any of the purposes indicated in the first and second sentences. Is there any sound reason for believing that the Legislature intended that the leasing power conferred by the third sentence be broader, and that it extend to both *sold* and *unsold* lands?

The power to lease for oil and gas and other mineral development conferred on the Commissioner by the third sentence is "under Statutes governing the leasing for mineral purposes [of] all other *unsold* permanent free school lands." If, as Humble asserts, the purpose of this language was simply to incorporate the procedure provided in Art. 5421c for executing leases and make that procedure applicable in the leasing of both sold and unsold lands, why was that purpose not plainly stated as was done with reference to forfeited lands in Art. 5371, where it is provided that such land "shall be subject to lease for oil and gas *under the procedure* provided by law for the leasing

of unsold surveyed public school lands"? And why was the word "other" used? Use of the words "*other* unsold permanent free school lands" indicates that the lands dealt with in the entire sentence are *unsold* lands. Moreover, the first sentence provides that the Commissioner may lease for grazing purposes "under existing laws relating to the leasing for grazing purposes of unsold school land." Surely it cannot be said that this language simply incorporates a procedure in the first sentence for leasing both *sold* and *unsold* land for grazing purposes; and yet, the language is almost identical with the language in the third sentence.

■ We recognize, as Humble suggests, that interests in land other than the full fee title may be escheated to the State; and that severed mineral interests, leasehold estates, possibilities of reverter, and the like, may thus become free school *lands*. But we are not concerned in this case with such interests in land, and have no occasion to determine how the Legislature intended that they be sold or leased, if, indeed, any provision has been made therefor. What we hold is that Art. 3281 confers no power on the Commissioner to execute leases for oil and gas and other mineral development on escheated land which has been sold by the State from the Permanent Free School Fund. And we hold further that when the full fee title to escheated land is owned by the Fund and the land is sold with a reservation of all minerals, the Relinquishment Act of 1919 constitutes the owner of the soil the agent of the State for the purpose of negotiating and executing oil and gas leases thereon.

We assume the Commissioner of the General Land Office will recognize the lease executed by Standard as a valid lease and that he will receive and file the certified copy thereof as required by law. Writ of mandamus will issue only if he refuses to do so.

CULVER, NORVELL and GREENHILL, JJ., dissenting.

GREENHILL, Justice.

I respectfully dissent.

Humble's alternative position set out in the majority opinion should be sustained. In my opinion, the 1934 amendment to Article 3281 confers on the Commissioner of the General Land Office the exclusive authority to lease escheated lands. It is unnecessary, therefore, to decide whether the Relinquishment Act has been repealed, or whether it applies only to school lands sold prior to the enactment of House Bill 358.

As amended, Article 3281 created a special category of permanent free school fund lands. Hence, the sale and leasing of those lands are governed entirely by the terms of the Article, and the provisions of the statute preclude Standard from executing an oil and gas lease on the land in controversy.

Article 3281, as amended in 1934, after setting escheated lands apart to the Permanent Free School Fund and directing that they be listed as escheated permanent free school lands, says:

"The Commissioner of the General Land Office may lease said lands for grazing purposes under existing laws relating to the leasing for grazing purposes of unsold school lands. The Commissioner of the General Land Office may lease said lands for agricultural, residential, business or other purposes for a term of not to exceed two (2) years, said rental to be payable in money, the amount of said rental and all other terms of the lease to be fixed by the Commissioner of the General Land Office. *Any escheated permanent free school lands shall be subject to lease for oil and gas development or subject to other mineral development under Statutes governing the leasing for mineral purposes [of] all other unsold permanent free school lands.* Any escheated permanent free school lands may be sold by the Commissioner of the General Land Office for not less than one-tenth of the purchase price in cash and the balance of said purchase price payable in nine equal annual installments, said deferred installments to bear interest at the rate of six (6) per cent per annum. Any lands so sold shall be sold to the highest bidder as are other public free school lands but no escheated lands shall be sold at a price of less than Two Dollars and Fifty Cents ($2.50) per acre. All sales of escheated permanent free school lands shall be with a reservation to the State of all the minerals in the land in favor of the Permanent Free School Fund. All sums received from the leasing, mineral developments, or sale of escheated lands shall be deposited in the Permanent School Fund of Texas. The Commissioner of the General Land Office is authorized to adopt such regulations as he deems necessary to carry out this Article. Said regulations or forms adopted shall be approved by the Attorney General."

This Court recognized in Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167, at 172, 104 S.W.2d 4 (1937), that Article 3281 creates a special category of land in the Permanent Free School Fund in which all minerals, rather than royalties as under Article 5421c, are reserved to the State when escheated school lands are sold by the State. But the question here is whether Article 3281 authorizes the Land Commissioner to execute oil and gas leases on lands sold from the special category with a reservation of all minerals. If it does, it must follow that the owner of the land cannot also be authorized to execute oil and gas leases thereon by the Relinquishment Act.

The first three sentences in the quoted provisions of Article 3281 define the powers of the Land Commissioner to execute leases. The third of the sentences, which has been emphasized in the quotation of the Article, defines the power of the Commissioner to execute mineral leases. Humble asserts that the sentence means that the Commissioner is authorized to lease *all* escheated permanent free school lands, *sold and unsold,* for oil

and gas and other mineral development, *according to the procedures provided in other statutes for the leasing of unsold lands.* Standard et al. contend that the sentence means that the Commissioner's authority to lease for oil and gas and other mineral development *is confined to unsold lands* as in the case of other free school lands under Article 5421c. I agree with Humble's interpretation of the sentence

It is our duty to give the sentence the meaning the Legislature intended it to have insofar as it lies within our ability to do so. When the Legislature fashioned the language of the third sentence, it knew that it was providing in the same Article for the sale of escheated lands with a reservation of all minerals to the State. Keeping that fact in mind, legislative intent of the language used in writing the third sentence is, it seems to me, keyed to the opening word of the sentence, "any."

The word "any" has a variety of meanings, depending on the context in which it is used. See 3 Corpus Juris Secundum, p. 1398 et seq.; 3A Words and Phrases, p. 53 et seq.; Black's Law Dictionary, 3rd ed., p. 119. When used in a plural sense, particularly in an affirmative sentence, the word is very generally held to mean "all." See Doherty v. King, 183 S.W.2d 1004, at 1007 (Tex.Civ.App.1944, writ dismissed); Branham v. Minear, 199 S.W.2d 841, at 845 (Tex.Civ.App.1947, n. r. e.); Hime v. City of Galveston, 268 S.W.2d 543, at 545 (Tex. Civ.App.1954, n. r. e.); 3 Corpus Juris Secundum, p. 1400; 3A Words and Phrases, p. 59. The sentence before us is an affirmative sentence, and the word "any" is used in the sentence in a plural sense. In the context in which it is used, it means "all." Given the meaning of "all," the sentence reads: "*All* escheated permanent free school lands shall be subject to lease * * * under Statutes governing the leasing for mineral purposes [of] all other unsold permanent free school lands." So written, the latter part of the sentence can mean nothing more than that the procedures provided in other statutes for leasing unsold lands shall

govern the leasing by the Commissioner of escheated permanent free school lands.

I would hold that Article 3281 authorizes the Commissioner of the General Land Office to lease all escheated permanent free school lands, sold and unsold, for oil and gas and other mineral development. It would follow that the oil and gas lease executed by Standard to Trace Mining Company is not a valid lease, and that the Commissioner of the General Land Office is not under a legal duty to receive and file the certified copy tendered.

CULVER and NORVELL, JJ., join in this dissent.