**VALERO TRANSMISSION COMPANY, Appellant,**

v.

**HAYS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, Appellee.**

No. 14474.

Court of Appeals of Texas, Austin.

Dec. 18, 1985.

Rehearing Denied March 5, 1986.

M. Frank Powell, Robert J. Myers, M. Frank Powell & Associates, Austin, for appellant.

Adrian M. Overstreet, Evelyn N. Howard-Hand, Kammerman, Overstreet & Hurren, Chester E. Young, Young & Navarro, Austin, for appellee.

Before POWERS, EARL W. SMITH and BRADY, JJ.

POWERS, Justice.

Hays Consolidated Independent School District recovered judgment against Valero Transmission Company for delinquent ad valorem taxes, penalties, interest, and attorneys fees, from which judgment the

company appeals. We will affirm the judgment.

## THE CONTROVERSY

In an original petition filed June 1, 1983, the school district prayed for recovery of taxes imposed against the company for the tax year 1982, alleging that the taxes had become delinquent when the company failed to pay them by February 1, 1983 after receiving the district's tax bill. The school district sued for imposition of personal liability for the tax but not for foreclosure of its tax lien.

Valero answered in the cause by two pleas in abatement, five affirmative defenses, and a general denial.

The pleas in abatement alleged: (1) the company did not own all the property upon which the 1982 taxes had been imposed; and (2) the school district lacked authority to bring the suit for delinquent taxes. These two pleas were ultimately overruled by the trial court.

Valero's five affirmative defenses were all based upon allegations that the taxes claimed by the school district were excessive, grossly excessive, illegal, invalid, void, discriminatory, and worked a substantial injury to Valero because the taxes were based upon a theory, scheme, or formula that utilized excessive and unequal valuations of the company's property. These familiar allegations invoked, of course, the company's constitutional right to an assessment in proportion to the market value of its property and to equal taxation with other taxpayers—constitutional guarantees established by the terms of Tex. Const. Ann. art. VIII, §§ 1, 20 (1955 & Supp.1985). *See generally* Yudof, *The Property Tax in Texas Under State and Federal Law,* 51 Tex.L.Rev. 885, 896–99 (1973). The trial court ultimately refused Valero's tender of proof respecting its allegations that it was taxed unequally and on an excessive valuation of its property.

Finally, Valero alleged a counterclaim against the school district. The claim purports to be a cause of action for judicial review of the assessment decision made by the appraisal review board for Hays County, a statutory cause of action created and authorized by § 42.01 of the new Property Tax Code under which the school district imposed the 1982 taxes.[1] Tex.Tax Code

---

1. The new Property Tax Code became effective January 1, 1982. It therefore governs the present dispute concerning the 1982 school taxes claimed by the school district against Valero. There can be little dispute that the Code was intended to remedy the many inequities that characterized the previous administration of the ad valorem tax by local taxing authorities, or "taxing units" in the words of the new Code. *See generally* Yudof, *The Property Tax in Texas Under State and Federal Law,* 51 Tex.L.REv. 885 (1973).

Inequities lay not only in local administration of the ad valorem tax. They also existed in the judicial process when courts were asked to enjoin the taxation process, to award recovery for a delinquent tax, or to award recovery for a tax paid under protest. While the Texas Constitution is quite explicit in requiring equal and uniform taxation in proportion to the market value of property, as set forth in Tex.Const.Ann. art. VIII, §§ 1, 20 (Supp.1985), taxpayer success in establishing these rights in particular cases was rare indeed, owing to various legal doctrines, controlling presumptions, and burdens of proof that were, practically speaking, insurmountable. While a taxpayer had at common law an admitted theoretical right of action to vindicate his constitutional rights, he seldom

prevailed as a practical matter because of the impediments. Yudof, *supra.*

These judicially created impediments did not evidence a purblind judiciary. Rather, they existed because they were essential to effectuate another important public policy: the orderly collection of revenue so that the functions of government should not be dependent upon the outcome of a multitude of lawsuits. *City of Wichita Falls v. J.J. & M. Taxman Refining Co.,* 74 S.W.2d 524, 528 (Tex.App.1934, writ ref'd); *Taxation—Taxpayer's Remedies,* 16 Tex.L.Rev. 234, 238 (1938). This public policy was thus in direct conflict with those evidenced in Art. VIII, §§ 1, 20 of the State Constitution whenever a taxpayer claimed a constitutional violation in his suit against a taxing authority or in his defense of a suit for delinquent taxes.

To accommodate these competing imperatives the Code now provides for a regular, systematic, certain, and effective remedy for a taxpayer who believes his tax to be erroneous for any reason whatever, *including* its alleged unconstitutionality because it is not in proportion to the market value of his property or because it is not equal and uniform. The remedy provided by the Code is an administrative proceeding before an appraisal review board (characterized by many trial-type procedures similar to those found in judicial proceedings) wherein the

board determines a taxpayer's protest of his taxes. This administrative remedy is established and governed by Chapter 41 of the Code. The board's determination of the taxpayer's protest is not final. If the taxpayer is not satisfied with the board's determination, he has a right of "appeal" to district court, wherein he may try the matter anew under the provisions of Chapter 42 of the code, which governs this statutorily created cause of action. In its decision, the district court may fix the appraised value of the taxpayer's property, enter whatever order is required to ensure equality of appraisal, and enter any other order necessary to preserve rights protected by the law or impose duties the law requires. (§§ 42.24, 42.25, 42.26). Further judicial review may be had by the taxpayer in the appellate courts of the State (§ 42.28).

The new Code concurrently provides for an uninterrupted flow of tax revenue, as evidenced by its provisions for supplemental tax bills, corrected tax bills, and refunds following the administrative-judicial review proceedings, whether the taxpayer's protest ends with the decision of the appraisal review board, with the judgment of the district court, or with the judgment of an appellate court. (§§ 26.15(a), (d)–(f); 42.-42; 42.43). This implies in the strongest terms that an imposed tax shall be paid, *as imposed* by the taxing unit and *as evidenced by a tax bill,* in the ordinary course—that is to say, by February 1 of the tax year—subject to the taxpayer's right of refund on the determination of his protest or the taxing unit's right of additional tax should it prevail in its administrative "challenge," whether in the appraisal review board or on judicial review of that board's determination. (*See generally* §§ 41.03, 41.05, 41.06, 41.07, 42.02).

The public interest in preserving an uninterrupted revenue is most strikingly indicated in § 42.08 of the Code, where it is provided that the pendency of a suit for judicial review does not affect the date taxes become delinquent; and, moreover, that a taxpayer may not maintain his action in district court unless he pays the greater of: (1) the undisputed amount of tax or (2) his tax in the preceding year. While no similar provision pertains expressly to a taxpayer-protest proceeding before the appraisal review board (no doubt because in most counties all taxpayer protests will be determined before the tax ever becomes delinquent), any harmonious orchestration of all the Code provisions requires that a taxpayer protest shall not delay or prevent the appraisal, assessment, and collection processes prescribed by the Code in Chapters 23–26 and 31. For example, as mentioned in the text, the very provision that permits the tax rolls to be *corrected,* in consequence of the board's determination of a taxpayer's protest or in consequence of an "appeal" to district court from the board's determination, presupposes that the board has *previously* but erroneously *approved* the "appraisal records" from which the tax roll results and from which the erroneous tax was imposed. (§ 26.15).

In 1983, the Legislature amended § 26.01 of the Code by adding subsection (c), to be effective January 1, 1984. It provides as follows:

> The chief appraiser shall prepare and certify to the assessor for each taxing unit a listing of those properties which are taxable by that unit *but which are under protest and therefore not included on the appraisal roll approved by the appraisal review board and certified by the chief appraiser....*

1983 Tex.Gen.Laws. Ch. 884, § 3, at 4946 (emphasis added). The amendment was not effective at the times material to the present case. However, the emphasized language of the amendment implies that the appraisal review board shall withhold its approval of any property appraisal that is the subject of a protest (or presumably, a challenge by a taxing unit), but approve the balance of the appraisal records and return the records to the chief appraiser. There was no comparable amendment to Chapter 41 of the Code governing the board's procedures in approving the appraisal records. For example § 41.12 remains unchanged:

> The appraisal review board shall *complete* its review of the appraisal records, approve the records, and submit a list of its approved changes in the records to the chief appraiser by July 20 or as soon thereafter as practicable.

(emphasis added). Nothing in Chapter 41 purports to authorize the board to approve the uncontested portions of the appraisal record while withholding from its approval those portions involving a taxpayer protest. We note as well that the 1983 amendment also alters the consistency in Code terminology that had previously existed. The amendment refers to "the *appraisal roll* approved by the appraisal review board," (emphasis added), but, under the Code, the board only has authority to approve the "appraisal records." The "appraisal roll" results from the board's changes in the appraisal records and its approval thereof after the changes. (§ 25.24).

Thus, under the 1983 amendment it may be contended that the Code no longer contemplates a single approval by the board of the mass of appraisal records as a whole; but rather, an approval of the uncontested portions of the records followed by the board's "approval" of the contested portions in stages as it adjudicates each taxpayer protest. This possibility, inferrable by implication from the 1983 amendment, would create serious conflicts with other Code provisions and place in disarray the general working of the taxation process. For example, what meaning should be assigned § 26.04(b) of the Code, wherein the assessor is directed to submit to the governing body of the taxing unit an "appraisal roll for the unit showing the total appraised, assessed, and taxable values of *all* property...." (emphasis added). When would a tax become "delinquent" as to a taxpayer whose protest has not been adjudicated by the

Ann. § 42.01 (1982). The statutory cause of action is authorized to be brought by a taxpayer as an "appeal" from the order of an appraisal review board determining a property owner's "protest" under Subchapter C of Chapter 41 of the Code. The trial court denied recovery on the counterclaim.

Common to all Valero's allegations are the following facts: Valero received from the Hays County Appraisal District a notice of the appraised value assigned to the company's property. The company contested the appraisal by timely filing a taxpayer protest with the Hays County Appraisal Review Board. Thereafter, the school district mailed Valero a tax bill based upon the contested appraisal. The company failed to pay the tax bill before February 1, 1983, the date it became delinquent under § 31.02 of the Code.[2] It is undisputed that the Hays County Appraisal Review Board had not determined Valero's taxpayer protest by February 1, 1983—a determination essential to Valero's statutory right, under § 42.01 of the Code, to sue for judicial review. While Valero's taxpayer protest remained undetermined by the board, the school district on June 1, 1983 filed its suit to collect the delinquent 1982 tax.

In a bench trial, the court below overruled Valero's pleas in abatement, refused evidence tendered by the company to establish its affirmative defenses, and rendered judgment against it for the delinquent 1982 taxes and associated penalties, interest, and attorney's fees. Valero appeals on 43 points of error. Essential to all of them are one or both of the following premises:

(1) The Code provisions for administrative review by an appraisal review board, and its provisions for judicial review of the board's decision, in cases of taxpayer protests brought before the board, are not the exclusive remedies of a taxpayer dissatisfied with his property appraisal or some other aspect of his ad valorem tax; and

(2) A taxing unit, the school district here, may not institute a lawsuit for delinquent taxes and recover judgment therein against a taxpayer until the taxpayer's protest has been determined by the appraisal review board.

We disagree with these postulates and hold they are contrary to the express and implied provisions of the new Code, as these are set out in a footnote.[3]

### THE CODE REMEDIES FOR IMPROPER TAXATION ARE EXCLUSIVE

■ Before enactment of the new Code, there existed a very unsatisfactory state of affairs relative to the common-law remedies created by the judicial branch to permit a taxpayer to resist unconstitutional taxation. *Texas Architectural Aggregate v. Adams*, 690 S.W.2d 640 (Tex.App.1985, no writ); Yudof, *supra* at 895–96. The chief characteristic of this state of affairs was that the taxpayer normally lost because of various legal doctrines, controlling presumptions, and burdens of proof that were judicially interposed to protect the regularity of public revenues. Yudof, *supra*. To alleviate the unfairness under which a taxpayer labored in his suit to prevent unconstitutional taxation, the Code substituted a systematic scheme of *administrative* review by a new entity—an appraisal review board created in each county—and *judicial* review, by a district court having jurisdiction, on "appeal" from the final determination made by the appraisal review board. *Texas Architectural Aggregate v. Adams, supra*. There can be no

board until after February 1, which is the only date prescribed for that purpose by the Code? Are unprotesting taxpayers in a taxing unit to bear alone the effect of the higher rates and resulting taxes necessitated when large segments of the appraisal records remain unapproved by the board owing to taxpayer protests? Is taxation "uniform" or "equal" under the Constitution when, by the simple expedient of filing a protest, a property owner is permitted to postpone payment of his taxes until it is convenient, casting such burden on the unprotesting taxpayers?

These interesting questions need not concern us in the present appeal, however, for the 1983 amendment was not effective at the times material to the present litigation.

2. Parenthetical section references hereafter are to the Tax Code.

3. See fn 1, *supra*.

doubt that this scheme for administrative and judicial review was intended to supplant the common-law remedies that previously existed, with their characteristic unfairness to taxpayers who contended their taxes were unconstitutional. *Id.* Nor may it be doubted that the Legislature intended this scheme to be a taxpayer's *exclusive* remedy:

> The procedures prescribed by this title [the Property Tax Code] for adjudication of the grounds of protest authorized by this title are *exclusive,* and a property owner may not raise any of those grounds:
>
> (1) in defense to a suit to enforce collection of delinquent taxes; or
>
> (2) as a basis of a claim for relief in a suit by the property owner to arrest or prevent the tax collection process or to obtain a refund of taxes paid.

§ 42.09 (emphasis added). *Texas Architectural Aggregate v. Adams, supra; Herndon Marine Products v. San Patricio County,* 695 S.W.2d 29 (Tex.App.1985, no writ); *Brooks v. Bachus,* 661 S.W.2d 288 (Tex.App.1983, writ ref'd n.r.e.).

The scope of the statutory grounds of protest allowed a taxpayer suggests the all-inclusiveness of § 42.09. These grounds are specified in § 41.41 where the Code enumerates *what* actions a property owner may protest in the administrative proceeding before an appraisal review board: (1) *a taxing unit's appraisal of his property or its market value*; (2) *the unequal appraisal of his property*; (3) *the inclusion of his property on the appraisal records*; (4) the denial of an exemption; (5) a determination that his land does not qualify for appraisal; (6) identification of the taxing units that may tax his property; (7) *a determination that he is the owner of the property*; and (8) *"any other action that applies to the property owner and adversely affects him"* (emphasis supplied). A determination by the appraisal review board of *any* of these grounds is reviewable in a suit for judicial review under § 42.01, for the scope of § 42.01 extends to "an order of the appraisal review board determining a protest by the property owner" (§ 42.01(a)). Indeed,

the reviewing court is specifically authorized to correct unequal and excessive appraisals (§§ 42.24, 42.25, 42.26). These were, of course, the grounds necessary to the pre-Code common law actions invoked by Valero in the present case. Yudof, *supra* 895–96.

The necessary consequence of making the Code provisions *exclusive,* as to the remedy provided therein for an unconstitutional or otherwise erroneous appraisal, is to abolish the previously existing common law actions created to prevent unconstitutional taxation. *Texas Architectural Aggregate v. Adams, supra.* Here, as in *Adams,* the property owner does not challenge the constitutionality of § 42.09 in making exclusive the remedies provided by the Code. That is to say, Valero does not contend the statutory remedies are uncertain or inadequate substitutes for the former common law actions abolished by the Code. *See generally Sax v. Votteler,* 648 S.W.2d 661 (Tex.1983); *Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951 (1955).

We therefore hold the Code remedies of administrative and judicial review are a property owner's exclusive remedies when he is dissatisfied with his property appraisal or any other aspect of his ad valorem tax falling within the grounds of protest allowed him under § 41.41 of the Code. Many of Valero's points of error ultimately rest upon a contrary theory. They are, in consequence, overruled.

## DETERMINATION OF A TAXPAYER'S PROTEST IS NOT A PREREQUISITE TO THE BRINGING OF A SUIT FOR THE DELINQUENT TAX

■ Valero's remaining points of error depend upon a premise that the Code requires that a taxpayer's protest be determined by the appraisal review board before a taxing unit may impose a valid tax against the taxpayer; consequently, a delinquency suit may not be maintained against the taxpayer, for want of a valid tax, so long as his protest to the board remains undetermined by that body. Actually, Valero's contention is even broader,

for it contends that a taxing unit may not impose a valid tax until *all* taxpayer protests, concerning property within *all* units of the district, are determined by the appraisal review board. We disagree with the premise, whether in its broader or narrower form.

Beyond any doubt, the board's decision on any grounds raised in a taxpayer's protest is a prerequisite to *his* suit for judicial review of the board's decision. (§ 42.01). And, as we have discussed above, the combined administrative-judicial review provisions of the Code establish statutory remedies that are the exclusive remedies available to a taxpayer dissatisfied with the appraisal of his property or some other aspect of the tax that adversely affects him. But it does not follow from this that the board's determination is a prerequisite to a suit *by a taxing unit for delinquent taxes.*

▆▆▆ In urging the contrary, Valero reasons from § 41.01 of the Code. That section establishes the scope of review permitted an appraisal review board in its examination of the appraisal records supplied to it by the chief examiner of the appraisal district. Section 41.01 provides:

The appraisal review board shall examine the appraisal records for the appraisal district to determine whether:

(1) appraisals are substantially uniform in terms of their relationships to the appraised value required by law;

(2) an exemption or a partial exemption is improperly granted;

(3) land is improperly granted appraisal as provided by Subchapter C, D, or E, Chapter 23 of this code; or

(4) the records do not conform to the requirements of law in any other respect.

If it finds an error in the appraisal records, the board is empowered to direct their correction (§ 41.02). The Code empowers a *taxing unit* to "challenge" several aspects of the appraisal records (§§ 41.03, 41.04).

The Board is required then to determine all such challenges "before approval of the appraisal records as provided by Section 41.12 of this code." (§ 41.07(c)). Similarly, a *property owner* is entitled to "protest" any of the aspects of the appraisal records listed in § 41.41, as discussed previously. The board's determination of such "protests" is governed by § 41.47 of the Code, which provides:

(a) The appraisal review board hearing a protest shall determine the protest and make its decision by written order.

(b) If on determining a protest the board finds that the appraisal records are incorrect in some respect raised by the protest, the board by its order shall correct the appraisal records by changing the appraised value placed on the protesting property owner's property or by making the other changes in the appraisal records that are necessary to conform the records to the requirements of law.

(c) *The board shall determine all protests before approval of the appraisal records as provided by Subchapter A of this chapter.*

(d) *The board shall deliver by certified mail a notice of issuance of the order and a copy of the order to the property owner and the chief appraiser.*

(emphasis added). Valero contends that it has never received the order mentioned in § 41.47(d) because the board has not yet determined the company's protest. And because such an order is a statutory prerequisite to judicial review under Chapter 42 of the Code (*see, e.g.,* §§ 42.01, 42.06(a)), Valero contends a district court may not entertain a suit for delinquent taxes brought by the school district. Valero's contention confuses the judicial-review provisions of the Code, on "appeal" from an order of the board, with an original proceeding in district court to recover judgment for a delinquent tax.[4]

---

4. In this contention, Valero erroneously equates (1) the statutory cause of action for judicial review on "appeal" from a decision of the appraisal review board with (2) a suit brought by a taxing unit to recover delinquent taxes or to foreclose its statutory lien therefor, or both.

The former is a statutory cause of action authorized by § 42.01 of the Code. It must be filed in a district court (§ 42.21) having jurisdiction in the county where the appraisal review board is located (§ 42.22), which court is statutorily em-

Valero *also* contends, however, that § 41.47(c) is quite literal and explicit in directing the appraisal review board to "determine all protests before" approving the appraisal records; and, because such approval is essential to initiate the sequence of official acts by which a valid tax is ultimately imposed, there may be no valid tax and hence no delinquent tax unless and until the board has determined *all* taxpayer protests. This contention refers to the sequence of official acts which follow the board's approval of the appraisal records: when approved by the board, the "appraisal records" become the "appraisal roll" (§ 25.-24); from this appraisal roll, the chief appraiser determines the "appraisal roll for the unit" (§ 26.01); using the appraisal roll for the unit, a governing body calculates and notifies the unit assessor of the "tax rate" (§ 26.05); and, the assessor applies the tax rate to the appraised values listed on the appraisal roll for the unit, converting it into the "tax roll" by entry of the taxes thereon (§ 26.09), from which individual "tax bills" are prepared and mailed to the property owners shown on the tax roll (§ 31.01).

Not surprisingly, Valero contends that we should mechanically enforce the "plain meaning" of § 41.47(c) to hold that no valid tax may be imposed by a taxing unit unless and until the appraisal review board has determined all taxpayer protests that may have been filed under § 41.41 of the Code and, presumably, all taxing-unit challenges that may have been filed under § 41.03. There can be no question that this is *a* meaning reasonably to be inferred from the language of § 41.47; indeed, if that section be considered *in isolation* from the re-

mainder of the Code, it is the most reasonable meaning to be inferred. Nevertheless, Valero's theory and the meaning it imputes to § 41.47(c) depend ultimately upon an assumption that § 41.47 can have *only* a single meaning to be inferred *solely* from the language used *therein*. In nonlegal usage, this assumption compels the inference that "drinking a toast" is an impossibility and a "clothes-horse" is an animal. This is a false assumption, however, and it has no place in statutory analysis and construction.

 Instead, we are required first to seek out the *legislative intent* from a *general* view of the Code; and once that has been ascertained, it follows as a matter of course that we shall construe § 41.47(c) consistently with and in furtherance of the legislative purpose. *Citizens Bank of Bryan v. First State Bank*, 580 S.W.2d 344 (Tex.1979). It may happen that two or more statutory provisions are in clear conflict. We are enjoined in such cases to harmonize the repugnant provisions and give effect to both by assigning each a meaning that will permit each to stand. *Duval Corporation v. Sadler*, 407 S.W.2d 493 (Tex.1966); *Standard v. Sadler*, 383 S.W.2d 391 (Tex.1964); *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550 (1937). Finally, it is proper that we consider the history of the subject matter with which the Code deals in arriving at the legislative purpose and intent we are to impute to any Code provisions. *Calvert v. Fort Worth National Bank*, 163 Tex. 405, 356 S.W.2d 918 (1962). How then do these generalities apply to § 41.47(c), and the questioned statement therein that "[t]he

---

powered to award a wide range of remedies (§§ 42.24–42.26) for a tax that is erroneous on any ground. On the other hand, the latter cause of action by a taxing unit for delinquent taxes is in no sense an "appeal" in review of the board's determination, for in a delinquent-tax suit by a taxing unit the taxpayer may *not* raise any of the grounds listed in § 41.41 as being determinable by the appraisal review board (§ 41.41). Moreover, a delinquent-tax suit is *not* required to be brought in district court within a specified number of days after the board's determination of a taxpayer protest or taxing unit challenge, but may be brought in any "court of competent

jurisdiction for the county in which the tax was imposed" (§ 33.41) at any time after a tax becomes delinquent (§ 33.41), that is to say, generally after February 1 of the tax year (§ 31.02). While there are other important differences in the two suits, these are sufficient to demonstrate the error in Valero's assumption that the statutory provisions applicable to an "appeal" from the board's determination under Chapter 42 of the Code are applicable in a suit for delinquent taxes brought by a taxing unit. Several of Valero's points of error depend upon this erroneous assumption.

board shall determine all protests before approval of the appraisal records as provided by Subchapter A of this Chapter"?

■ We observe initially that the reference to the board's "approval of the appraisal records" is a reference to Subchapter A of Chapter 41 (§§ 41.01–41.12) of the Code. The approval process is one directed at the mass of appraisal records delivered to the board by the chief appraiser, a delivery he is required to make "[b]y May 15 or as soon thereafter as practicable...." (§ 25.22(a)). The board is directed to examine the appraisal records to determine whether they conform to legal requirements (§ 41.01) and to

complete its review of the appraisal records, approve the records, and submit a list of its approved changes in the records to the chief appraiser *by July 20 or as soon thereafter as practicable.*

§ 41.12 (emphasis added). Therefore, with the leeway implied by the reference to practicalities, the Code provides a basic period of 66 days within which the board must examine, change, and approve the mass of appraisal records submitted to it by the chief appraiser.

In oral argument, Valero conceded the obvious and notorious fact that if a large City lies within the county, an appraisal review board may have in excess of 12,000 taxpayer protests filed under Subchapter C of the Code (§§ 41.41–41.47). Each protesting taxpayer is entitled to a trial-type adjudication of his protest (§§ 41.44–41.69). Thus, if Valero is correct in its position that the board must adjudicate *all* such protests before a valid tax may be imposed by any taxing unit within the board's jurisdiction, then the board may be required to adjudicate as many as eight (8) cases every hour of every day within the 66 days allowed it. The obvious impossibility of the board's doing so casts grave doubt upon Valero's theory and the arid and mechanical meaning it imputes to § 41.47(c). The Code applies alike to appraisal review boards that may find themselves in such circumstances and to those that *may well be* able to adjudicate all taxpayer protests within the basic 66-day period allowed. Thus, the language of § 41.47(c) must be assigned a

meaning that will accommodate the vastly different circumstances.

In arriving at the proper meaning to be assigned § 41.47(c), we refer first to our previous discussion concerning the Legislature's intent and purpose to alleviate the unfairness which characterized pre-Code attempts by taxpayers to resist unconstitutional taxation. In adopting the Code scheme for an orchestrated process of administrative and judicial review of any complaint a taxpayer may have concerning his ad valorem tax, including any complaint about its constitutionality, the Legislature for the first time gave taxpayers a meaningful, fair, certain, and orderly remedy for unconstitutional or other improper taxation. May we then conclude that the Legislature intended by this remedial legislation to subvert the *other* important public interest in government having an uninterrupted and certain revenue for its purposes? It is doubtful that the Legislature so intended; for, in addition to the protest remedy allowed the taxpayer, the Code provides for refunds of excessive or other erroneous taxes paid by him, implying that he must already have paid his tax bill in the regular course established elsewhere in the Code (§ 31.11).

Finally, we doubt the validity of Valero's theory because it *creates* a needless conflict between § 41.47(c) (as interpreted by Valero) and related provisions of the Code. For example, § 26.15 of the Code provides that an appraisal review board may order correction of the *tax roll* as a result of the board's adjudication of a taxpayer protest. But, under Valero's theory, a tax roll could not come into existence until after the board had first determined *all* taxpayer protests. Similarly, § 25.25 of the Code provides generally that an *appraisal roll* may not be changed after the appraisal records are approved by the board. Nevertheless, the section allows for two exceptions: the appraisal roll may be changed to reflect the outcome of a taxpayer protest adjudicated by the board under Chapter 41 or by a reviewing court under Chapter 42. The first statutory exception would be meaningless under Valero's theory, for un-

der that theory an appraisal roll may not come into existence until the board had adjudicated *all* taxpayer protests. Rather than creating these conflicts between various Code provisions, we should interpret the Code in a way that avoids them.

We therefore decline to assign § 41.47(c) the mechanical meaning for which Valero contends. Instead, we engraft thereon the proviso that the board shall determine all protests before approval of the appraisal records *or as soon thereafter as practicable*. In other words, we interpret § 41.-47(c) as being directory rather than mandatory. We base this conclusion on the following grounds:

1. Such an interpretation is more consonant with the statutory scheme and the legislative purposes that underlie the Code—particularly those which seek to accommodate the competing imperatives of regularity in the public revenue and fairness to taxpayers. A contrary interpretation would produce conflict in various statutory provisions, defeat the general scheme of the Code and the legislative purposes that underlie it, and strike down the balance so carefully wrought by the legislature in accommodating the two imperatives.

2. Provisions such as § 41.47(c) are *ordinarily* included solely for the purpose of promoting the proper, orderly, and prompt conduct of business—an inference that becomes compelling here in the absence of any words or phrases implying that the

board may *not* determine a taxpayer protest or a taxing-unit challenge *after* board approval of the appraisal records submitted to it by its chief appraiser. *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943 (1956).[5]

We therefore overrule Valero's remaining points of error. Finding no error as assigned by Valero, we affirm the judgment of the trial court.

---

**5.** There is no absolute test by which it may be determined whether a statutory provision is mandatory or directory. *The fundamental rule is to ascertain and give effect to the legislative intent.* Although the word "shall" is generally construed to be mandatory, it may be and frequently is held to be merely directory. In determining whether the Legislature intended the particular provision to be mandatory or merely directory, consideration should be given to the entire act, its nature and object, and the consequences that would follow from each construction. Provisions which are not of the essence of the thing to be done, but which are included for the purpose of promoting the proper, orderly and prompt conduct of business, are not generally regarded as mandatory. *If the statute directs, authorizes or commands an act to be done within a certain time, the absence of words restraining the doing thereof afterwards or stating the consequences of failure to act within the time specified, may be considered as a circumstance tending to support a directory construction.* *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943, 945 (1956) (emphasis added).

In oral argument, we requested that Valero suggest *why* the Legislature might have intended that an appraisal review board *must* adjudicate *all* taxpayer protests before approving the appraisal records so as to permit the sequence of official acts which follow and result in a valid tax, especially in view of the adverse effect upon the taxation process which would result from that construction if the board was required to adjudicate some 12,000 protests. Valero replied simply that such was the plain meaning of § 41.47(c) as it was written.